IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SERGHEI KUNDILOVSKI,

                              Petitioner,                              OPINION AND ORDER

     v.
                                                                        22-cv-166-wmc
WARDEN CHRISTOPHER BUESGEN,

                              Respondent.

---

Petitioner Serghei Kundilovski is presently incarcerated at the Stanley Correctional Institution, having pleaded guilty in Dunn County Circuit Court Case No. 2017CF327 to three counts of homicide by intoxicated use of a vehicle while already having a past intoxicant-related conviction or revocation.  In this case, he seeks a federal writ of habeas corpus under 28 U.S.C. § 2254, arguing that his pleas were invalid because:  (1) they were not voluntarily or intelligently made; and (2) he was denied effective assistance of counsel.  (Dkt. #1.)  Because Kundilovski fails to show that he is entitled to relief under the federal habeas corpus standard of review, the court will deny his petition and dismiss this action.

FACTS[1]

A. Background

On or about July 13, 2017, Kundilovski drove his car in the wrong direction on Interstate 94 in Dunn County, Wisconsin.  Kundilovski collided nearly head-on with an

---

[1] Unless otherwise indicated, the following facts are taken primarily from the state appellate court decision rejecting his claims on the merits, *State v. Kundilovski*, 2021 WI App 50 (Jan. 12, 2021) (per curiam), the state court record, which is attached to the respondent's initial brief in opposition, and supplemental records filed by petitioner.  (Dkts. ##10, 15, 16).

oncoming vehicle, killing all three of its occupants.    Kundilovski himself spent approximately one month in the hospital following the crash being treated for injuries, including two brain hemorrhages, which constituted a traumatic brain injury ("TBI").

As a result of the collision, the State of Wisconsin charged Kundilovski with nine counts in total, three related to each victim:    (1) first-degree reckless homicide; (2) operating a motor vehicle while revoked, causing the death of another; and (3) homicide by intoxicated use of a vehicle while having a prior intoxicant-related conviction or revocation.    Kundilovski was born in Moldova and has only been in the United States since approximately 2010.    As a result, while fluent in Russian, he had limited English proficiency.    Thus, an interpreter was used during all court proceedings at which Kundilovski was present.    However, Kundilovski's trial attorney, Scott Schlough, reportedly did not use an interpreter when meeting with Kundilovski outside of court.

### B.  Plea Hearing

Approximately four and one-half months after the deadly collision, Kundilovski entered guilty pleas to the three counts of homicide by intoxicated use of a vehicle under the terms of a written plea agreement.    In exchange for Kundilovski's guilty pleas, the State agreed to recommend the remaining six counts and a traffic case be dismissed but read in for purposes of sentencing and restitution.    The parties further agreed that a presentence investigation report ("PSI") would be prepared, and both sides would then be free to argue for an appropriate sentence as they saw fit.

Consistent with the circuit court's practice throughout, Kundilovski had an interpreter who was fluent in Russian during the plea hearing.    (Dkt. #10-8.)    At the

beginning of the hearing, Kundilovski confirmed that he understood the interpreter. (*Id*. at 5.) The circuit court then conducted a plea colloquy, confirming, among other things, that Kundilovski understood the elements of the crimes to which he was pleading guilty. (*Id*. at 6-9.) The court also explained that the maximum penalties for each of the three charges was a forty-year sentence and a $100,000 fine. (*Id*.) Kundilovski responded that he understood the maximum penalties, including that the sentences could be imposed consecutively, for up to a maximum of 75 years. (*Id*. at 8.)

In addition, Kundilovski confirmed that he was satisfied with his counsel (Attorney Schlough) and had enough time to speak with him about his plea, including asking any questions that he had. (*Id*. at 9-10.) Kundilovski further confirmed that he reviewed the circuit court's written plea questionnaire and waiver-of-rights form with Attorney Schlough and signed it. (*Id*. at 10.) Among other things, that form lists the maximum penalty for the three offenses as "$100,000 or 40 years imprisonment or both x 3 = $300,000 or 120 years imprisonment or both (maximum term of confinement of 75 total years)." (Dkt. #15-1, at 19.) The form also states, "I understand that the judge is not bound by any plea agreement or recommendations and may impose the maximum penalty." (*Id*.) By signing the form, Kundilovski confirmed that he had read it, understood its contents, had reviewed it with Schlough, and had answered its questions truthfully. (*Id*. at 20.)

During the plea colloquy, the circuit court also inquired about Kundilovski's ability to understand English, to which Kundilovski responded that his understanding was "very limited." (Dkt. #10-8, at 11.) Still, Kundilovski did state that he had been employed as a truck driver in the United States for multiple years and was able to follow road signs. (*Id*. at 11-12.) The court then acknowledged the interpreter's presence and inquired directly

to Kundilovski whether there was "anything so far that has been said that you do not understand." Kundilovski responded, "No, I understand everything." (*Id*. at 12.) The circuit court then again emphasized to Kundilovski that it could sentence him up to the maximum possible penalty, regardless of any recommendations:

> And do you understand that the Court is not bound by any recommendations? The only bounds the Court has are the maximum possible penalties that we spoke about. The Court can't go beyond that. But my understanding is that your agreement is both parties would be free to argue what the sentence may be. Do you understand that?

(*Id*. at 14.) Kundilovski again responded, "Yes." The court then accepted Kundilovski's pleas and found him guilty on the three counts of homicide charged.

## C. Sentencing

Next, the county probation department conducted a presentence investigation, summarizing the facts of Kundilovski's offenses and his background. (Dkt. #16.) More specifically, after interviewing Kundilovski with the assistance of an interpreter, the probation officer made the following observation about his mental ability and level of understanding:

> Mr. Kundilovski appears to be of at least average intelligence. He noted he can read and write fluently in his native language, Russian. He can read English well enough to get by and can write the same at a limited level. He speaks broken English and is fluent in Russian. He follows English conversation fairly well and used the provided interpreter in the interview for this document seemingly very efficiently. There did not appear to be any issues with [him] carrying on a fluid conversation with the interpreter in his native tongue. At no time was it indicated that he was not understanding the process or the communications. The answers provided either directly by himself or through the interpreter were appropriate to the conversation and added no doubt he communicated efficiently.

(Dkt. #16, at 13.)  The probation officer further observed that Kundilovski "appeared to know the difference between right and wrong, was oriented to the time[,] place[,] and event, and remained on task throughout the entire interview process.  (*Id*. at 13-14.)

Kundilovski again had access to a Russian interpreter at his sentencing hearing. (Dkt. #10-9, at 1.)  At that hearing, the State asked the circuit court to impose consecutive sentences totaling seventy-five years' initial confinement and fifteen years' extended supervision.  (*Id*. at 110.)  Defense counsel Schlough did not make a specific sentence recommendation, although he argued the court should not impose the maximum penalties. (*Id*. at 119-21.)  The court ultimately imposed consecutive sentences totaling 75 years' initial confinement and 30 years' extended supervision.  (*Id*. at 138; Dkt. #10-1, at 2.)

### D. State Postconviction Motion

Kundilovski subsequently filed a postconviction motion in state court, seeking to withdraw his guilty pleas, arguing that his pleas were not knowing, intelligent, and voluntary based on (1) his language comprehension issues, (2) Schlough's failure to use an interpreter during their out-of-court discussions about the plea agreement, and (3) Schlough's advice that Kundilovski would likely receive aggregate sentences of three to seven years if he pled guilty.  Based on all three factors, Kundilovski asserted that he "understood and believed that by pleading guilty, he was guaranteed a 3-7 year sentence." Kundilovski also argued attorney Schlough was ineffective "by not using an interpreter to ensure that . . . Kundilovski understood basic legal concepts and by failing to retain an expert to establish . . . Kundilovski's language limitations."

In support of his motion, Kundilovski also attached a report authored by psychologist Brenda Leske regarding his "ability to understand language, both auditory-receptive language and written information."  Leske conducted her evaluation of Kundilovski in June and July 2019, over one and one-half years after he entered his guilty pleas.

The circuit court next held an evidentiary hearing on Kundilovski's postconviction motion.  At the hearing, Leske explained that the main areas of language she assessed during her evaluation of Kundilovski were comprehension, naming, and recognition.  She summarized her findings as follows:

> Mr. Kundilovski is struggling substantially with . . . regard to his language functioning.  He has demonstrated substantial difficulty processing meaningful language; even language presented both in English and in Russian.  The results indicate that his underlying reasoning capacity appears to be intact but he -- you know, [the interpreter] and I really tried to do our best to do what we could to support the process for him but he . . . did have . . . substantially weak vocabulary; substantially weak long-term memory; substantially weak comprehension.

> His comprehension was like the first to the ninth percentile for the impaired borderline-impaired range.  He had word-finding difficulties. His naming was at the fifth percentile.  His, you know, language comprehension, processing, naming, and memory were all problematic.  He was, however, able to repeat back very well, you know, at the sixty-fourth percentile.  So it may look at times as though he's very well able to understand when in fact he's not because he -- and he may himself think because he can repeat the words back to you that he understands but there's no understanding needed simply to pair back someone's words.  So that's a concern.

(Dkt. #10-10, at 17.)

Leske also testified that Kundilovski's language comprehension skills were "poor" in both English and Russian, and that the brain hemorrhages Kundilovski had experienced as a result of the collision constituted a TBI, which could affect his memory and language

comprehension.  In particular, she opined that Kundilovski's TBI could have adversely affected his ability to understand his legal proceedings.  (*Id*. at 20.)  Because of his TBI, Leske opined further that Kundilovski would "need extra help to understand things" that a person without a TBI would not need.  (*Id*. at 21.)

Kundilovski's defense counsel Schlough also testified at the postconviction hearing, confirming that he had discussed the plea agreement with Kundilovski outside of court on at least three occasions.  (*Id*. at 33.)  While no interpreter was used during those discussions, in which they communicated in English, Schlough testified he did not consider asking for an interpreter.  (*Id*.)  Instead, Schlough explained that he and Kundilovski used a speech-to-text translation program to communicate "a couple times" and "that seemed to work for the most part."  (*Id*. at 37.)  In fact, Schlough testified he used that program to make a sentence-by-sentence translation of the plea questionnaire into Russian, and Kundilovski "actually made corrections as we were going through saying, this doesn't seem to say the same thing."  (*Id*. at 42-43.)

Schlough also testified that when he had concerns about whether Kundilovski understood a concept during their discussions of the plea agreement, he would attempt to explain that concept in "smaller words, less complicated terms" until it appeared that Kundilovski understood.  (*Id*. at 37.)  He further explained that:

> Often we would go back and forth in that discussion.  Here's a statement. He would say, I don't know.  I would say some clarification of it.  And then he would say, is that like this or -- and we would keep working that way until I thought we had an understanding for the most part.

(*Id*. at 41-42)

Schlough acknowledged that he initially had concerns about whether Kundilovski understood the distinction between concurrent and consecutive sentences. (*Id*. at 33-34.) Therefore, Schlough "broke it down to mean that it would be one sentence served and then you would start your next one . . . and he seemed to understand that concept that it was one after another." (*Id*. at 34.) However, Schlough also admitted to telling Kundilovski's postconviction attorney that he was not "one hundred percent sure whether . . . Kundilovski understood what consecutive sentencing meant." (*Id*. at 34.)

Similarly, Schlough testified that he was initially concerned about Kundilovski's understanding of the concept of judicial sentencing discretion. (*Id*. at 36.) More specifically, Schlough recalled Kundilovski appeared at first to believe that after the parties made their sentencing recommendations, the circuit court would be required to adopt one of those recommendations, rather than "craft[ing] whatever sentence the judge deemed appropriate." (*Id*.) However, after discussing the concept of judicial sentencing discretion with Kundilovski "a couple of times," Schlough believed they had "cleared . . . up" this misunderstanding. (*Id*. at 36-37.) At the same time, Schlough conceded that he could not "say for sure because I'm not Mr. Kundilovski." (*Id*. at 37.) Schlough further conceded that he never considered hiring an expert to evaluate Kundilovski's language comprehension. (*Id*.)

Perhaps most fundamentally, Schlough confirmed telling Kundilovski that he would likely receive aggregate sentences totaling only three to seven years. (*Id*. at 34.) Schlough explained that this estimate was based on a conversation he had with an individual who wrote private PSIs and had previously prepared PSIs for the Department of Corrections ("DOC"). (*Id*. at 35.) Although telling Kundilovski that aggregate sentences totaling three

to seven years were likely, Schlough also testified that Kundilovski never indicated that he believed the court could *not* impose sentences exceeding that length. (*Id*. at 46-47.)

In contrast, when Kundilovski testified at the postconviction hearing, he recalled not telling Schlough that he wanted an interpreter during their out-of-court discussions, but claimed this was because he did not think an interpreter "could help [him] in any way." (*Id*. at 49-50.) He recalled Schlough telling him he would receive sentences totaling "three, five, or seven years" if he took the plea agreement, and that was one of the reasons he did so. (*Id*. at 50.) He further testified that Schlough told him "it would be forty" years without the plea agreement. (*Id*.) Even so, Kundilovski conceded that Schlough told him that "the judge could pick whatever sentence he wanted to pick no matter what the plea deal was." (*Id*.)

Kundilovski also conceded that the circuit court had told him during the plea hearing, it was *not* bound by any sentence recommendations and could impose the maximum penalties, and Kundilovski acknowledged telling the court that he understood those concepts. (*Id*. at 51.) Even after that colloquy, however, Kundilovski testified that he still believed the court could not impose sentences exceeding seven years "because the plea agreement was that." (*Id*. at 52.) Kundilovski also testified that he believed he had to answer "yes" to all of the court's questions during the plea colloquy, although he did not elaborate or explain the basis for that belief. (*Id*. at 51.) Finally, Kundilovski testified he would not have entered guilty pleas had he known that the court could impose the maximum sentences, but would instead have gone to trial. (*Id*. at 52.)

The State presented the testimony of two law enforcement officers at the postconviction hearing. First, State Trooper Kyle DeVries testified that he had interviewed

9

Kundilovski at the hospital several days after the collision using a Russian interpreter. (*Id.* at 57.) That interview was video recorded and was played for the court during the postconviction hearing. (*Id.*) The tape reflected, and DeVries testified, that Kundilovski was able to answer some of his questions during the interview in English, without waiting for them to be translated into Russian. (*Id.*) Second, Sergeant Douglas Ormson of the Dunn County Sheriff's Office testified that Kundilovski communicated with him and with other jail staff in English without using an interpreter. (*Id.* at 62.) Ormson also testified that on one occasion, Kundilovski asked whether Ormson "knew of anybody else that could play chess because he couldn't find anybody that he could play with decently, and then he made a joke [that] he was going to have to play with staff." (*Id.* at 63.) However, Kundilovski denied making that statement, and testified instead that he had first learned how to play chess while in jail. (*Id.* at 55.)

At the close of the postconviction hearing, the circuit court made several findings of fact. The court found the testimony of Schlough, DeVries, and Ormson to be "credible." (*Id.* at 72.) While the court acknowledged psychologist Leske's testimony regarding Kundilovski's language comprehension difficulties, it also noted Leske "was not here at the time of the plea." (*Id.*) Rather, the court held that "there's a transcript [of the plea hearing], … the record is what it is as it relates to the plea when the Court made findings that . . . Kundilovski knowingly, voluntarily, and intelligently entered his plea." (*Id.*)

The circuit court also found Kundilovski's testimony during the postconviction hearing "to be somewhat incredible," finding instead that even though Kundilovski had a "limited understanding of English, he was able to understand quite a bit." (*Id.*) In particular, the court observed that Kundilovski had been in the United States "for several

10

years" and even "worked as a commercial truck driver." (*Id*.)  The court also found that the video of DeVries' interview of Kundilovski showed him "talking and understanding some basic stuff certainly that the trooper was talking with him about." (*Id*. at 73.)  The court further noted that the jail staff "were in a position to be able to observe" Kundilovski, and found him "able to function in the jail without an interpreter." (*Id*.)  The circuit court next found that Schlough spoke to Kundilovski about the nature of the plea agreement on multiple occasions, and at least from Schlough's perspective, "it appeared that his client understood these concepts." (*Id*. at 73.)  Last, the trial court discussed its own impression of Kundilovski's understanding of the concepts discussed during the plea hearing itself, stating:

> [W]hat I recall observing him, his responses were appropriate; he understood what he was being asked. And if he carried with him some belief that, you know, his attorney . . . told him, you know, I think it might be in this range, he clearly was told that the Court was not bound by a recommendation and he was told what the maximum possible penalties were. And, again, these concepts were explained to him by . . . Schlough on a number of occasions.

(*Id*. at 74.)

"[N]ot [being] satisfied or convinced . . . that . . . Kundilovski did not understand or know what he was doing when he entered" his pleas, therefore, the circuit court saw "no reason" to disturb its determination during the plea hearing that Kundilovski's pleas were knowing, intelligent, and voluntary. (*Id*.)  Indeed, "from the [circuit] [c]ourt's perspective it appeared that [Kundilvoski] understood; he said he understood; he gave . . . appropriate answers to the questions the Court had. It was, in the Court's opinion, not extremely complicated." (*Id*.)  Accordingly, the court found Kundilovski had failed to demonstrate the existence of a "manifest injustice" that required withdrawing his pleas. (*Id*.)

Finally, turning to Kundilovski's ineffective assistance claim, the circuit court concluded Schlough's representation was neither deficient nor prejudicial. (Dkt. #10-10, at 74-75.) The court noted that Schlough had "spent quite a bit of time with [Kundilovski] explaining things," including the possibility of maximum penalties being imposed in his case, which the court then also explained during the plea hearing. (*Id*. at 75.) The court also held that Schlough was not ineffective merely because his estimate regarding the length of Kundilovski's sentences turned out to be incorrect. (*Id*.) The court further found the plea agreement was straightforward; both parties were free to argue for whatever time they believed was appropriate at sentencing; and the State had *not* agreed to recommend any specific sentence. (*Id*.) Therefore, the circuit court denied Kundilovski's postconviction motion to withdraw his pleas. (*Id*.)

### E. Wisconsin Court of Appeals' Decision on Postconviction Motion

In review of the circuit court's denial of Kundilovski's postconviction motion, the Wisconsin Court of Appeals found that the circuit court had properly rejected Kundilovski's claim that language comprehension difficulties prevented him from understanding the consequences of his pleas based on its own observations of his demeanor in open court. *State v. Kundilovski*, 2021 WI App 50 (Jan. 12, 2021) (per curiam). The court of appeals noted that, although Kundilovski argued his pleas were not intelligently made because his defense attorney did not utilize an interpreter during their out-of-court meetings, the circuit court specifically rejected "the evidence Kundilovski presented to support his claim that his pleas were not knowing, intelligent, and voluntary due to the

12

lack of an interpreter during his out-of-court meetings with Schlough." *Id.* at ¶ 36.    The

court of appeals further observed:

> Instead, the court expressly found Schlough's testimony credible. Schlough
> testified that although Kundilovski initially struggled to understand certain
> legal concepts, Schlough was ultimately able to explain those concepts in a
> way that Kundilovski could understand by breaking them down into simpler
> terms and by using translation software when necessary. Schlough's
> testimony supports the court's finding that Kundilovski was able to
> understand the information Schlough presented during their out-of-court
> discussions, even without an interpreter.

*Id.* As additional support for its factual findings, the circuit court credited testimony from

Trooper DeVries, who stated that Kundilovski was able to answer some of his questions

during his post-accident interview in the hospital without waiting for the interpreter to

translate them into Russian. *Id.* at ¶ 47. The circuit court also relied on the video recording

of that interview. *Id.* In addition, the circuit court credited testimony from Sergeant

Ormson, who stated that Kundilovski was able to communicate with jail staff without an

interpreter. *Id.* More specifically, the circuit court found that Schlough had explained the

maximum penalties to Kundilovski, as well as the fact that the court was not bound by the

parties' recommendations, and that Kundilovski understood that information. *Id.* Based

on Schlough's testimony, the court further found that he had merely provided Kundilovski

with an estimate of the likely length of his sentences. *Id.*

As for the circuit court's finding that Leske's testimony was entitled to little weight

because she was not present at the plea hearing in particular (dkt. #10-10, at 72), the

Wisconsin Court of Appeals held that "[a] fact finder is not required to accept an expert

witness's opinion, even if it is uncontradicted." *Kundilovski*, 2021 WI App 50 at ¶ 34 (citing

*State v. Fleming*, 181 Wis. 2d 546, 561, 510 N.W.2d 837 (Ct. App. 1993)). Even accepting

13

Leske's opinion that Kundilovski's impairments meant that he needed extra help to understand things, the Court of Appeals also noted Schlough's testimony that he took extra time to explain the plea agreement *and* the circuit court's questionnaire to Kundilovski, and the circuit court found Schlough's testimony to be "credible." *Id.*

The Wisconsin Court of Appeals found further evidence in the record to support the circuit court's finding that Kundilovski's language comprehension was not so limited as to prevent him from knowingly, intelligently, and voluntarily entering his pleas. Specifically, noting that the circuit court found credible that the testimony given by Sergeant Ormson, regarding Kundilovski's comment about being unable to find a decent chess opponent while in jail, the Wisconsin Court of Appeals found this testimony supported an inference that "Kundilovski's mental faculties were not significantly impaired after the accident," as did his own testimony that he learned to play chess while in jail, both suggesting that his mental functioning was sufficient to allow him to knowingly, intelligently, and voluntarily enter his guilty pleas." *Kundilovski*, 2021 WI App 50 at ¶ 35.

The Wisconsin Court of Appeals also observed that Kundilovski's own testimony did not support his claim that he needed an interpreter during his out-of-court discussions with his defense counsel. *Id.* at ¶ 38. Kundilovski conceded that Schlough told him "the judge could pick whatever sentence he wanted to pick no matter what the plea deal was." *Id.* Likewise, Kundilovski did not testify that he could not understand Schlough's advice, nor did he testify that he was unaware of the maximum penalties. *Id.* Thus, the Court of Appeals concluded that Kundilovski's testimony also supported the circuit court's finding that Schlough was able to communicate adequately with Kundilovski, even without an interpreter. *Id.*

14

Finally, the Wisconsin Court of Appeals noted that the circuit court also rejected Kundilovski's claim that Schlough's "misleading" advice regarding the likely length of his sentences rendered his pleas invalid. *Id*. at ¶ 39. The Wisconsin Court of Appeals concluded that the circuit court implicitly found that Schlough never promised or guaranteed that Kundilovski would receive aggregate sentences totaling only three to seven years if he pled guilty. *Id*. While Kundilovski testified at the evidentiary hearing that he believed the circuit court was limited to imposing sentences of three to seven years, the circuit court did not find his testimony credible. *Id.* The Wisconsin Court of Appeals concluded that the circuit court's findings established that "Kundilovski was told -- and understood -- that the court could impose the maximum penalties and was not limited by any sentence recommendations." *Id*. at ¶ 40. The Court of Appeals concluded, therefore, that the circuit court properly rejected Kundilovski's claim that his pleas were not knowing, intelligent, or voluntary. *Id.* Ultimately, the Wisconsin Court of Appeals rejected Kundilovski's challenge to the validity of his guilty plea based on the circuit court's fact findings and credibility determinations, which were made following an evidentiary hearing. After the Wisconsin Court of Appeals affirmed the circuit court's decision, and the Wisconsin Supreme Court denied Kundilovski's petition for review, this federal lawsuit followed.

## OPINION

Petitioner seeks a federal writ of habeas corpus, claiming that his guilty pleas were not knowingly made and that he was denied effective assistance of counsel. (Dkt. #1.) Because these claims were adjudicated on the merits in state court they are subject to the

15

legal standard set forth in 28 U.S.C. § 2254(d), which demands that state court decisions be given substantial deference.  *See Renico v. Lett*, 559 U.S. 766, 773 (2010) (28 U.S.C. § 2254(d) "imposes a 'highly deferential standard for evaluating state-court rulings,' . . . [which] 'demands that state-court decisions be given the benefit of the doubt.'") (citations omitted).

Under this deferential standard, a federal habeas corpus court may not grant relief unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]"  28 U.S.C. § 2254(d)(1).  An "unreasonable application" only occurs "if the state court correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case."  *Bell v. Cone*, 535 U.S. 685, 694 (2002).  This is a high bar:  the state court's application of federal law "must be objectively unreasonable, not merely wrong; even clear error will not suffice."  *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam) (internal quotation marks and citation omitted).  Rather, a state prisoner seeking habeas relief "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

To the extent that a petitioner challenges a factual finding on which the state court's adverse ruling rests, he must show that the finding was unreasonable in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d)(2).  In particular, state court findings of fact and credibility determinations are presumed correct on federal habeas

review unless the petitioner rebuts that presumption with "clear and convincing" evidence to the contrary.  28 U.S.C. § 2254(e)(1); *Woolley v. Rednour*, 702 F.3d 411, 426-27 (7th Cir. 2012).  The presumption of correctness also applies to factual findings made by a state court of appeals based on the trial-court record.  *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981).

For the reasons discussed below, petitioner has failed to show that the last state court to analyze his claims on the merits -- the Wisconsin Court of Appeals -- unreasonably denied relief or that its decision was based on an unreasonable determination of the facts. *See Wilson v. Sellers*, 584 U.S. 122, 125 (2018) (holding that when a state supreme court decision does not come accompanied by reasons, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale").

## I.     Voluntary, Intelligent, and Knowing Guilty Pleas

In his postconviction motion asking the circuit court to set aside his guilty pleas, petitioner argued that his pleas were not voluntarily and knowingly made because:  (1) he had limited English-language proficiency and comprehension ability; (2) he did not have an interpreter during his out-of-court discussions with his defense counsel; and (3) his defense counsel gave misleading advice that led petitioner to believe his combined sentences would total only three to seven years.  The circuit court denied petitioner's similar arguments after holding an evidentiary hearing on his motion for postconviction relief.  (Dkt. #10-10, at 75.)  To prevail on his claim that the circuit court erred, the Wisconsin Court of Appeals concluded he needed to prove, "by clear and convincing

evidence, that a refusal to allow plea withdrawal would result in manifest injustice." *Kundilovski*, 2021 WI App. 50 at ¶ 29 (citing *State v. Cajujuan Pegeese*, 2019 WI 60, ¶ 15, 387 Wis. 2d 119, 928 N.W.2d 590).  Noting further that a defendant may establish a manifest injustice by proving his plea "was not entered knowingly, intelligently, and voluntarily," the Wisconsin Court of Appeals rejected petitioner's claim based on the circuit court's findings of fact and credibility determinations, concluding that he failed to prove that his pleas were not entered knowingly, intelligently, and voluntarily.  *Id*. at ¶¶ 29-40.

The Due Process Clause of the Fourteenth Amendment requires that a defendant's plea of guilty be knowingly and voluntarily entered.  *Boykin v. Alabama*, 395 U.S. 238, 242 (1969).  "The longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'"  *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)).  A plea is voluntary and must stand if the defendant enters the plea with full awareness of its direct consequences.  *Virsnieks v. Smith*, 521 F.3d 708, 715 (7th Cir. 2008) (citing *Brady v. United States*, 397 U.S. 742, 755 (1970)).  A plea is intelligent and knowing when the defendant is competent, aware of the charges, and advised by competent counsel.  *United States v. Jordan*, 870 F.3d 1310, 1316 (7th Cir. 1989) (citing *Brady*, 397 U.S. at 756).

As noted above, the Wisconsin Court of Appeals found that the circuit court properly rejected petitioner's claim that he was unable to understand the consequences of his pleas due to language comprehension issues based on the circuit court's own observations of petitioner's demeanor in open court.  Based on those observations, the

circuit court found that petitioner understood the information the court had provided during the plea hearing, which included an explanation of the maximum possible penalties *and* an admonition that the court was not bound by the parties' sentencing recommendations. Although petitioner testified at the evidentiary hearing that he did not understand that the circuit court could impose sentences exceeding seven years, the circuit court rejected this testimony as not credible under all the circumstances presented. This is a finding of fact that is entitled to the presumption of correctness on federal review. 28 U.S.C. § 2254(e)(1); *Woolley*, 702 F.3d at 426-27.

Nevertheless, petitioner argues that the state court's conclusion is unreasonable in light of the expert psychological testimony from Dr. Leske, who opined at the evidentiary hearing that petitioner's language comprehension was poor. Specifically, between petitioner's traumatic brain injury, his oral and reading comprehension issues, and his language limitations, petitioner argues that Leske's testimony established that he could not understand written or oral communications regarding a plea, despite his appearing to understand. (Dkt. #18, at 37-38.) He argues, therefore, that the circuit court's findings should be given no deference.

However, a federal habeas corpus court has "no license" to reassess the credibility of witnesses whose demeanor has been observed by the state trial court, nor to reassess the weight due each. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). In an attempt to disturb the state court's findings, petitioner points to portions of the record in which he raised questions with his counsel about what "consecutive sentence" or "judicial discretion" meant. (Dkt. #18, at 30.) Instead, the portions of the record that he points to show that counsel explained those concepts to petitioner using smaller words and less complicated

terms until counsel was satisfied that he understood them.  (Dkt. #15-3, at 266, 267-69.)
Thus, petitioner's inquiries do not reflect an inability to understand the proceedings or the
consequences of his pleas, and they do not serve as clear and convincing evidence that the
circuit court's findings are erroneous in light of the rest of the record, which supports those
findings.  *See Sanders v. Radtke*, 48 F.4th 502, 511 (7th Cir. 2022) (a trial court's credibility
determinations based on its own observations are "'notoriously difficult to overturn under
§ 2254(d)(2)'") (quoting *Coleman v. Hardy*, 690 F.3d 811, 817 (7th Cir. 2012)).  Even as
to the opinions rendered by psychologist Leske, the circuit court had an ample record to
discount her concerns as to language comprehension in light of the repeated efforts by
petitioner's trial counsel and the circuit court to insure his understanding of the
uncertainty as to the possible length of his actual sentence, and the credibility of
petitioner's admission as to what he was told, as opposed to what he now claims to have
comprehended.  Regardless, the weight of these findings by the state circuit court and court
of appeals prevent this federal court from concluding otherwise.  Accordingly, petitioner
does not demonstrate that the Wisconsin Court of Appeals' decision was unreasonable or
contrary to clearly established precedent from the U.S. Supreme Court, and he further fails
to show that he is entitled to relief on this claim under 28 U.S.C. § 2254(d).

## II.  Ineffective Assistance of Counsel Claims

Petitioner argues further that he is entitled to relief because he was denied effective
assistance of counsel.  Specifically, he argues that his defense counsel failed to use an
interpreter when meeting with him outside of court to discuss the plea agreement, by failing
to retain an expert to establish his limitations, and by incorrectly advising him that he was

likely to receive sentences totaling no more than three to seven years. The Wisconsin Court of Appeals rejected this claim after finding that petitioner's defense counsel did not perform deficiently, citing *State v. Dillard*, 2014 WI 123, ¶¶ 84-85, 358 Wis. 2d 543, 859 N.W.2d 44, which sets out the legal standard found in *Strickland v. Washington*, 466 U.S. 668 (1984).

As Wisconsin Court of Appeals correctly noted, to prevail on an ineffective-assistance claim a defendant must show that counsel's performance fell below an objective standard of reasonableness and that prejudice resulted from that deficiency. *Strickland,* 466 U.S. at 687-88, 693. Judicial review of trial counsel's performance "must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id*. at 689. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690).

To establish prejudice, a defendant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Stickland, 466 U.S. at 694. In the context of pleas, a defendant must show the outcome of the plea process would have been different with competent advice. *See Missouri*

21

*v. Frye*, 566 U.S. 134, 148 (2012) (noting that *Strickland's* inquiry, as applied to advice regarding plea bargains, turns on "whether 'the result of the proceeding would have been different'") (quoting *Strickland*, 466 U.S. at 694).  Specifically, to prevail on a claim that ineffective assistance led to the improvident acceptance of a guilty plea, a defendant must show "that there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial."  *Hill*, 474 U.S. at 59.

There is again an added level of deference as to this question on federal habeas corpus review under § 2254(d).  "[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard."  *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  As a result, this standard is "doubly deferential" on federal habeas corpus review.  *Id*; *see also Richter*, 562 U.S. at 105 (emphasizing that the standards created by *Strickland* and § 2254(d) are "highly deferential," and "'doubly' so" when applied in tandem (citations omitted)).

Here, petitioner argues Schlough was ineffective by failing to use an interpreter when meeting with him outside of court, by failing to "retain an expert to establish . . . [his] language limitations," and by incorrectly informing petitioner that he was likely to receive sentences totaling only three to seven years.  The Wisconsin Court of Appeals rejected these claims based on the circuit court's factual findings, concluding that petitioner failed to establish that Schlough performed deficiently in any of those respects.  *Kundilovski*, 2021 WI App 50, at ¶ 44.

As to petitioner's claim that Schlough was deficient for failing to use an interpreter during their out-of-court meetings or to retain a language comprehension expert, the Wisconsin Court of Appeals found that this claim was defeated by the circuit court's findings based on Schlough's testimony. *Kundilovski*, 2021 WI App 50, at ¶ 45. Specifically, during Schlough and petitioner's out-of-court discussions, the circuit court found that Schlough was able to ensure petitioner understood the maximum penalties that could be imposed for his offenses and that the court was not bound by any sentence recommendations. *Id*. Schlough testified that he did so by explaining those concepts as simply as possible in English and by using translation software when necessary. Schlough also testified that he believed petitioner understood him, and the court accepted his testimony in that regard. *Id*. Schlough further testified that he explained the concept of consecutive sentences to petitioner, and petitioner seemed to understand it. *Id*. All of these findings are supported by the state court record. (Dkt. #15-3, at 266-70.)

Petitioner argues that every reasonable attorney in Schlough's position would have known he had to consult with an interpreter and a cognitive-skills expert to ensure he was communicating effectively with his client. In support of that argument, he cites several other factors, including: petitioner's TBI; his reliance on a Russian interpreter when being interviewed at the hospital and during hearings; petitioner's comments during attorney-client meetings that certain matters did not make sense to him; and a cultural disconnect that hampered petitioner's ability to understand whether a crime of recklessness could be punished with incarceration. (Dkt. #18, at 46.) As the Wisconsin Court of Appeals observed, however, petitioner's claim was undercut by his own testimony that he did not ask for an interpreter when speaking with Schlough because he did not think an interpreter

23

"could help [him] in any way." *Kundilovski*, 2021 WI App 50, at ¶ 45.  Under these circumstances, the Wisconsin Court of Appeals held that Schlough could reasonably have concluded that it was not necessary to retain either an interpreter or an expert to assess petitioner's language comprehension.  *Id.*  Thus, the Court of Appeals concluded that Schlough's failure to take those actions "did not fall outside the wide range of professionally competent assistance and, as such, did not constitute deficient performance." *Id.*  Moreover, even if some further care should have been taken to assess petitioner's comprehension, this federal court is again in no position to second guess the circuit court's factual findings that trial counsel took extraordinary steps to ensure he understood the basic concept of a recommended and actual sentence, as well as the discretion left to the trial judge to choose from a wide range of sentences.

The Wisconsin Court of Appeals also rejected petitioner's claim that Schlough was deficient when estimating the potential sentence he would receive.  *Id*. at ¶ 46.  The Court of Appeals concluded that Schlough did not deficiently mislead petitioner into believing he would receive sentences totaling only three to seven years because the circuit court found that Schlough carefully provided petitioner with an estimate of the likely length of his sentences, but did not guarantee or promise that petitioner's actual sentences would not exceed seven years.  *Id*.  While Schlough's prediction turned out to be incorrect, he testified that it was based on his consultation with an individual who wrote private PSIs and had previously prepared PSIs for the DOC.  *Id*.  The Wisconsin Court of Appeals noted that petitioner did not develop any argument on appeal that Schlough's reliance on that individual's opinion was unreasonable.  *Id*.

24

In addition, the record confirms that petitioner did not ask for the assistance of an interpreter when meeting with his counsel out of court because he knew he "was in a very difficult criminal situation" and did not believe having an interpreter present when discussing the plea agreement was necessary. (Dkt. #10-10, at 50.) Likewise, despite the prediction that petitioner could receive a sentence of three to seven years on each count, petitioner acknowledged that his attorney explained the maximum sentence he faced and further explained that the circuit court could pick whatever sentence he wanted. (*Id*.) Petitioner neither testified that he was unable to understand his attorney nor that an interpreter was required during their out-of-court meetings due to any inability to comprehend what he was being told. Because petitioner does not demonstrate that counsel's performance was deficient, the Wisconsin Court of Appeals' decision is entitled to double deference under *Strickland* and 28 U.S.C. § 2254(d).

Although the failure to demonstrate deficient performance dooms petitioner's claim, the Wisconsin Court of Appeals further found that petitioner also failed to establish that he suffered prejudice as a result of his counsel's allegedly deficient performance. *Kundilovski*, 2021 WI App 50, at ¶ 47. While petitioner testified he would not have entered his pleas had he known that the circuit court could impose the maximum sentences, the court did not find his testimony to be credible. *Id*. Although petitioner points to the evidentiary hearing transcript and notes that the circuit court only found him to be "somewhat incredible" (dkt. #26, at 22), the distinction makes little difference given that petitioner offers no credible basis to believe that he would have rejected the plea bargain and insisted on going to trial. *See Padilla v. Kentucky*, 559 U.S. 356, 372 (2010)

(emphasizing that a defendant challenging a guilty plea must demonstrate "that a decision to reject the plea bargain would have been rational under the circumstances").

The prejudice inquiry under *Strickland*, as modified by *Hill*, depends in large part on a prediction of what the outcome of the trial might have been and whether any affirmative defense would have been successful. *Hill*, 474 U.S. at 59. Petitioner has proposed *no* defensive theory, and he offers no persuasive argument showing that, under the facts of this case, he had anything to gain by proceeding to trial. The Supreme Court has acknowledged that defendants without a viable defense will be "highly likely to lose at trial" and will "rarely" be able to show prejudice from a guilty plea that reduces their sentencing exposure. *Lee v. United States*, 582 U.S. 357, 367 (2017). Petitioner does not qualify as one of those rare cases.

According to the presentence investigation, the offense occurred on July 13, 2017, several hours after petitioner was released from jail for driving without a license, which had been revoked earlier in June 2017, following a conviction for operating while intoxicated in Sauk County, Wisconsin. (Dkt. #16, 3-4.) Witnesses reported seeking petitioner driving erratically on the westbound lanes of Interstate 94. The Wisconsin State Patrol examined a dash cam recording from a semi-truck, which captured petitioner weaving through traffic at a high rate of speed, and determined that he was traveling at an average speed of 106 miles per hour at one point. As he attempted to pass two semi-trucks traveling side by side on the left shoulder, petitioner then veered left, entered the median, and re-entered the highway in the eastbound lane.

Other drivers even reported pulling over to avoid petitioner's oncoming car, which came close to striking several other vehicles with no attempt to slow down or stop.

Eventually, petitioner struck the front end of the victims' vehicle, killing Jeremy Berchem, age 27, Adam Kenderhammer, age 32, and Bryan Rudell, age 29.  Worse still, a blood draw taken after the accident showed that petitioner had an ethanol level of 0.022 and had been "huffing" vaporized intoxicants from aerosol cans, which were found in his vehicle.

As noted above, the State charged petitioner with nine criminal counts, three for each victim:  three counts each of first-degree reckless homicide; operating a motor vehicle while revoked, causing death; and homicide by intoxicated use of a motor vehicle while having a prior intoxicant-related conviction or revocation.  (Dkt. #10-5, at 2-3.)  The first set of charges were Class B felonies, which could have resulted in a sentence of up to 60 years' imprisonment on each count.  Wis. Stat. § 939.50(3).  The second set of charges were Class H felonies, which could have resulted in a sentence of 6 years' imprisonment on each count.  *Id*.  The third set of charges, which are the ones that petitioner ultimately pleaded guilty to, were Class C felonies, which could have resulted in a sentence of up to 40 years' imprisonment on each count.  *Id.*  By agreeing to plead guilty to the three counts of homicide by intoxicated use of a motor vehicle with a prior intoxicant-related offense, the State agreed to dismiss the remaining six charges, reducing his exposure to a total of 120 years' imprisonment.  (Dkt. #25, at 43.)  He received less than that at sentencing, where the circuit court imposed a total of 75 years' initial confinement followed by 30 years of extended supervision.  (Dkt. #10-1, at 2.)

Even now, petitioner has advanced *no* theory of defense that he would have pursued if he elected to go to trial on all nine counts.  Instead, petitioner argues that he would have proceeded to trial, even with the smallest chance of success, because a win at trial would mean no deportation.  (Dkt. #18, at 61.)  The respondent notes that this argument is

unpersuasive because it appears petitioner knew that his green card had expired and that deportation was coming regardless of the result.  (Dkt. #10-10, at 46; Dkt. #10-9, at 121.)  Moreover, given the strength of the state's case against petitioner, and the absence of any viable defensive strategy, a wholesale acquittal at trial was highly unlikely.  Nor is it less likely that his prison sentence would have been any less than the term he received as the result of pleading guilty.

Indeed, the circuit court received over 100 victim impact statements from the victims' families, friends, co-workers, and the community.  (Dkt. #10-9, at 95.)  Many of the victims' family members and friends showed up to testify at the sentencing hearing in person, describing the victims as wonderful young men who were deeply loved, and asking for the maximum sentence possible.  (*Id.* at 7-92.)  In addition, the State played an audiotape of one of the 911 calls received on the day of the crash, and presented additional witness statements along with photographs of the incredible destruction caused by petitioner to the victims' vehicle.  (*Id.* at 106.)  Petitioner expressed little remorse and took no responsibility for his actions during his brief allocution.  (*Id.* at 126.)  Under these circumstances, petitioner fails to demonstrate actual prejudice as the result of his counsel's performance.  *See Gish v. Hepp*, 955 F.3d 597, 607 (7th Cir. 2020) (concluding in a guilty plea case that a defendant with "no likely prospect" of defeating the state's robust case against him failed to show actual prejudice from his counsel's deficient performance).  Accordingly, petitioner is not entitled to relief and his petition for a writ of habeas corpus under 28 U.S.C. § 2254(d) must be denied.

### III.  Certificate of Appealability

Under Rule 11 of the Rules Governing Section 2254 Cases, the court must issue or deny a certificate of appealability when entering a final order adverse to a petitioner.  To obtain a certificate of appealability, the applicant must make a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *Tennard v. Dretke*, 542 U.S. 274, 282 (2004).  This means that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further."  *Miller El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotations and citations omitted).  The petitioner has not made a showing, substantial or otherwise, that his conviction was obtained in violation of clearly established federal law as decided by the United States Supreme Court.  Because no reasonable jurist would debate whether the petition should have been resolved differently, the court will not issue petitioner a certificate of appealability.

ORDER

IT IS ORDERED that:

1.  The habeas corpus petition filed by Serghei Kundilovski (dkt. #1) is DENIED and this action is DISMISSED WITH PREJUDICE.

2.  A certificate of appealability is DENIED.

Entered on this 29th day of January, 2026.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

29